**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
PINE BLUFF DIVISION**

DONALD MANNING,
ADC #141541                                                                                          PLAINTIFF

v.                                    5:11-cv-00285-BSM-JTK

CARLTON DALSIS, et al.                                                                    DEFENDANTS

## PROPOSED FINDINGS AND RECOMMENDATIONS

### INSTRUCTIONS

The following recommended disposition has been sent to United States District Judge Brian S. Miller. Any party may serve and file written objections to this recommendation. Objections should be specific and should include the factual or legal basis for the objection. If the objection is to a factual finding, specifically identify that finding and the evidence that supports your objection. An original and one copy of your objections must be received in the office of the United States District Court Clerk no later than fourteen (14) days from the date of the findings and recommendations. The copy will be furnished to the opposing party. Failure to file timely objections may result in a waiver of the right to appeal questions of fact.

If you are objecting to the recommendation and also desire to submit new, different, or additional evidence, and to have a new hearing for this purpose before either the District Judge or Magistrate Judge, you must, at the time you file your written objections, include the following:

1.      Why the record made before the Magistrate Judge is inadequate.

1

2. Why the evidence to be proffered at the new hearing (if such a hearing is granted) was not offered at the hearing before the Magistrate Judge.

3. The details of any testimony desired to be introduced at the new hearing in the form of an offer of proof, and a copy, or the original, of any documentary or other non-testimonial evidence desired to be introduced at the new hearing.

From this submission, the District Judge will determine the necessity for an additional evidentiary hearing.

Mail your objections and "Statement of Necessity" to:

> Clerk, United States District Court
> Eastern District of Arkansas
> 600 West Capitol Avenue, Suite A149
> Little Rock, AR 72201-3325

## I.     Introduction

This matter is before the Court on the Defendants' Motions for Summary Judgment (Doc. Nos. 55, 58). Plaintiff filed Responses to the Motions (Doc. Nos. 65-67).

Plaintiff Manning is a state inmate incarcerated at the Ouachita River Unit of the Arkansas Department of Correction (ADC). He filed this action pursuant to 42 U.S.C. § 1983 while incarcerated at the Delta Regional Unit, alleging deliberate indifference to his serious medical and safety needs by Defendants. Defendants Dalsis, Lum, and Cook are correctional officers employed by the ADC. Defendants Jackson and Hubbard are nurses employed by Corizon, Inc., which is the medical services provider for the ADC. Plaintiff asks for damages from Defendants.

## II. Facts

### A. Plaintiff's Complaint (Doc. No. 2)

According to his Complaint, on September 29, 2010, Plaintiff was assigned to work on an inmate regional maintenance crew in Eudora, Arkansas, which involved cleaning a ditch around an elementary school. About 9:15 a.m., while using a hoe to chop the ground, he heard a sound like glass breaking and felt something hit his left eye. He told Defendant Dalsis that something hit his eye, and Dalsis told him to resume his work. About thirty minutes later, Dalsis permitted Plaintiff to wash out his eye, but told Plaintiff he could not speak to Defendant Lum about his eye until the break. Ten minutes later, Plaintiff asked again to speak with Lum and Dalsis stated he would speak with her first. After Dalsis spoke with Lum, Plaintiff was permitted to approach her and when she looked in his eye she saw the sunlight reflect off a sliver of glass. Lum then tried to wash the glass out of the eye and called the Unit transportation office to pick up Plaintiff. Plaintiff was then transported back to the Delta Unit Infirmary, where he was seen by Defendant Nurse Jackson about 1:15.

Jackson examined Plaintiff's eye and tried to wash the glass out of it. Then he used a q-tip to remove the sliver. At that time, Plaintiff claims his vision changed, due to the sliver cutting his eye, and he felt pain. Jackson placed a patch over Plaintiff's eye and sent him back to his barracks. At 7 p.m., Plaintiff returned to the Infirmary to see Nurse Hubbard, but did not see her until 11 p.m. Hubbard told him the Infirmary did not have the equipment needed to examine his eye and ordered him back to the barracks.

The following day, September 30, 2010, Plaintiff turned out for work with his eye patched and when he arrived at Eudora, two officers transported him back to Delta Unit, and then to the medical department at the Cummins Unit for examination. From there he went to see the optometrist at the Varner Unit and then to the emergency room in Little Rock where he underwent eye surgery.

Plaintiff claims Defendants Dalsis and Lum failed to take him seriously and Dalsis ordered him to return to work for forty-five minutes after the incident occurred. He also claims that when Defendant Jackson removed the glass from his eye, he caused the glass to slice his eye, and failed to provide him with pain medication or a work lay-in. He states Defendant Hubbard also failed to provide him with medication and a lay-in. Later, after his surgery, he claims Defendant Cook improperly denied him medical treatment.

      **B.**      **Plaintiff's Deposition Testimony (Doc. Nos. 55-1, 60-1)**

On September 29, 2010, the date of the incident at issue, Plaintiff signed a safety sheet prior to beginning work, and requested a pair of tinted safety glasses from the inmate assigned to distribute tools and equipment (Doc. No. 55-1, p. 3.) The inmate told Plaintiff that those glasses were not available, and Plaintiff asked for a pair of regular safety glasses. (Id. at p. 4.) However, Plaintiff did not want to wear the pair provided to him as they were scratched, and although he requested another pair, he did not receive them prior to the beginning of his work. (Id.) When Plaintiff began hoeing the ditch, he caught a dirt pile, which flew back and hit him in the face. (Id.) He wiped his face and tried to remove everything from his eye, and also rubbed his eye. (Id.; Doc. No. 60-1, p. 6.) He also asked

4

a fellow inmate to look into his eye, but he was not able to see anything in it. (Doc. No. 55-1, p. 5.) Dalsis later permitted him to wash out his eye, but would not permit him to talk with Defendant Lum until their break. (Id.) Initially, Lum was not able to see anything in Plaintiff's eye, but eventually saw a reflection of the glass and tried to wash it out. (Id. at p. 7.) She also patched his eye and asked him to write a witness statement stating that they offered safety glasses. (Id. at p. 8.) Plaintiff told her they didn't offer him glasses, but that he had requested them. (Id.) Plaintiff had worked on the regional maintenance crew for about eight months prior to the incident, had worked a similar job when incarcerated at another unit, and had worn safety goggles occasionally on prior jobs. (Id. at pp. 20-22, 27.)

When Plaintiff returned to the Unit, Defendant Jackson used a q-tip to remove the glass from his eye. (Doc. No. 60-1, p. 2.) Although Plaintiff was able to see out of his eye before the removal, after Jackson removed the glass it was like trying to look through a clear trash bag, where he could see an image but could not tell what it was. (Id.) Jackson then patched his eye and told Plaintiff he was on the list to see the doctor. (Id.) After Jackson removed the sliver, liquid leaked out of his eye "due to the hole he just made a little bigger." (Id. at p. 3.) Jackson also did not give him any medication for pain, but Plaintiff acknowledged that he did not tell Jackson he was in pain or ask for pain medication. (Id.) Plaintiff was called back to the infirmary about 10:30 that evening and saw Defendant Hubbard. (Id. at p. 3.) Although she took off the patch and looked at his eye, she was not able to see anything because the Infirmary lacked the proper equipment. (Id. at p. 4.) Therefore, she re-patched his eye and told Plaintiff to return to the barracks. (Id.) Plaintiff

told her that his eye was irritated, but she also did not given him any pain medication or a lay-in from work, so he returned to work the next day and traveled back to Eudora with the maintenance crew. (Id at pp. 4-5.) He admitted that he did not actually work that next day, since he was later picked up from Eudora and taken back to the Delta Unit. (Doc. No. 55-1, p. 28). Plaintiff admitted that at that time, he was not aware that Defendant Hubbard referred him to the Jones Eye Clinic in Little Rock the next day, because she did not tell him. (Doc. No. 60-1, p. 7.)

Following his eye surgery, he was instructed to report to the infirmary several times per day to receive eye drops. (Doc. No. 55-1, p 15-16.) On one of those occasions, Defendant Cook refused to allow him into the infirmary, stating Plaintiff had not been called for treatment, that the infirmary was full, and that he would have to return when called. (Id.) Plaintiff later returned to the infirmary and received his eye drops, and Defendant Jackson told him he talked with Cook and Plaintiff should not have similar problems in the future. (Id. at pp 17-18.) Jackson then also gave Plaintiff a written script permitting him daily access to the infirmary to receive his eye drops. (Id. at p. 18.) Plaintiff admitted that he had received two drops earlier that same day, prior to Defendant Cook's alleged denial of care, and then received a third drop later that same day. (Id. at p. 29.)

### III.   Summary Judgment Motions

Pursuant to FED.R.CIV.P. 56(a), summary judgment is appropriate if the record shows that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. See Dulany v. Carnahan, 132 F.3d 1234, 1237 (8th Cir. 1997). "The

moving party bears the initial burden of identifying 'those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.'" Webb v. Lawrence County, 144 F.3d 1131, 1134 (8th Cir. 1998), quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (other citations omitted). "Once the moving party has met this burden, the non-moving party cannot simply rest on mere denials or allegations in the pleadings; rather, the non-movant 'must set forth specific facts showing that there is a genuine issue for trial.'" Id. at 1135. Although the facts are viewed in a light most favorable to the non-moving party, "in order to defeat a motion for summary judgment, the non-movant cannot simply create a factual dispute; rather, there must be a genuine dispute over those facts that could actually affect the outcome of the lawsuit." Id.

    A.    **ADC Defendants' Motion**

        1.    **Defendants' Affidavits**

Defendant Dalsis states in his affidavit that inmates on the regional maintenance squad are offered safety goggles and are aware of their availability. (Doc. No. 55-3, p. 1.) He also states that on the date of the incident, Plaintiff did not complain to him that the safety glasses provided to him were too scratched to use. (Id.) He states that when Plaintiff notified him that he had something in his eye, he permitted him to flush his eye out with water and then contacted Defendant Lum. (Id. at p. 2.) Defendant Dalsis denies ordering Plaintiff back to work, and he refers to the incident report he completed following the incident. (Id. at pp. 2-4.)

Defendant Lum also states that safety glasses are always available to inmates and are offered at the beginning of each workday, and that a safety meeting is conducted on the bus at which time the inmates are informed of the tools and equipment to be used. (Doc. No. 55-2, p. 1.) She states Plaintiff did not complain to her that the goggles provided to him were too scratched to be used, and that when Dalsis radioed her that Plaintiff had something in his eye, she instructed him to send Plaintiff to her immediately. (Id. at p. 2.) She washed out his eye, notified the Unit infirmary that she needed transportation for him, and asked Plaintiff to write out a statement to explain what happened and whether he was offered safety glasses. (Id.) She also includes the incident report she completed, and Plaintiff's signed statement. (Id. at pp. 3-5.)

Defendant Cook states that on October 20, 2010, she was supervising the infirmary and monitoring the number of inmates permitted to enter at one time to see the nurse, noting that the maximum number of inmates allowed at one time is six. (Doc. No. 55-4, p. 1.) When Plaintiff arrived, she told him he had not been called down for treatment by a nurse, and that he could not enter because the infirmary was full. (Id. at pp. 1-2.) At that time, she was not aware that he was permitted unscheduled visits for his eye drops, and that neither Plaintiff nor any staff member had told her about his arrangement. (Id. at p. 2.) Later, the staff told her that Plaintiff was permitted to come to the infirmary during non-treatment call times. (Id.)

### 2. **Defendants' Arguments**

Defendants first state that Plaintiff's monetary claims against them in their official

capacities should be dismissed, pursuant to Will v. Michigan Dep't of State Police, 491 U.S. 58, 65-66 (1989) and Murphy v. State of Arkansas, 127 F.3d 750, 754 (8th Cir. 1997). They continue that Plaintiff fails to support a deliberate indifference claim against them, because he cannot show that they failed to act despite a knowledge of a substantial risk of serious harm, as set forth in Estelle v. Gamble, 429 U.S. 97 (1976), and Choate v. Lockhart, 7 F.3d 1370, 1373 (8th Cir. 1991). They note Plaintiff was not forced to perform work beyond his physical abilities, that he had prior experience with the work, and that he had access to safety devices and chose not to wear the goggles. Although Plaintiff claimed that he asked the inmate property person for a better pair of goggles prior to his arrival at the job, he does not claim that he informed Defendant Dalsis that he needed a pair of goggles prior to beginning his work. They state Plaintiff cannot show that Dalsis and Lum acted with "more than ordinary lack of due care for the prisoner's interest or safety," citing Stephens v. Johnson, 83 F.3d 198, 201 (8th Cir. 1996).[1] In addition, Defendants state that as a matter of law, failure to provide safety devises does not allege a constitutional violation, citing Warren v. Missouri, 995 F.2d 130, 131 (8th Cir. 1993).

Furthermore, Plaintiff's allegation that he was forced to wait forty-five minutes after the incident before speaking with Defendant Lum about his eye, does not support a

---

[1] In Stephens, the inmates alleged that Defendants were aware of safety problems at the workplace. The Court held that awareness falls short of creating a genuine issue of deliberate indifference to workplace safety. 83 F.3d at 201. "Simply failing to provide inmates who move furniture with steel-toed boots, protective eyewear, and hard hats, for example, does not establish a constitutional violation any more than failing to install a safety device on a saw despite knowledge of prior injuries." Id.

9

constitutional violation, because Defendant Dalsis permitted him to wash out his eye, and because Plaintiff admitted that his fellow inmate was not able to see anything in his eye. In addition, to support a claim based on delay of treatment, Plaintiff must offer verifying medical evidence to show that the delay resulted in a detriment to his health, citing Crowley v. Hedgepeth, 109 F.3d 500, 502 (8th Cir. 1997). In addition, Plaintiff admitted that during that time his eye was not bleeding, he was not in pain, and that it was just "irritating." (Doc. No. 55-1, pp. 5, 7, 27-28.)

With respect to his allegation against Defendant Cook, Defendants state that Cook was not aware Plaintiff was permitted to enter the infirmary without first being called, and that she was following her job responsibilities by not permitting any more inmates in the infirmary when it was filled to capacity. Defendants state that such behavior did not constitute deliberate indifference, and that again, Plaintiff fails to show that the delay in receiving one of his eye drop doses caused a detrimental effect to his health. He also cannot show that Defendant Cook acted with an intent to cause him harm and he admitted at the time that he did not have a script to show her that he had access to the infirmary. (Doc. No. 55-1, p. 32.)

### 3. Plaintiff's Response

In his Response, Plaintiff states that he was injured about 9:15 a.m. on September 29, 2010, but that Defendant Dalsis did not permit him to speak with Defendant Lum until about 10:45 a.m. He further states that Dalsis failed to keep him from harm while working, because he did not tell Plaintiff to use safety goggles. While he admits that Defendant Lum

tried to wash the glass out of his eye, he quarrels with her decision to call someone to come and get Plaintiff, rather than just packing up all the inmates and taking them back to the Unit when she determined Plaintiff needed further assistance. As a result, he was required to wait from 10:45 until officers arrived at Eudora at about noon to pick him up. Plaintiff also denies that a safety meeting was conducted on the bus, and states that inmates are required to sign the safety sheet or face disciplinary action. He also claims Defendant Lum should have told him to use the safety goggles.

With respect to his allegations against Defendant Cook, Plaintiff states that he visited the infirmary on nineteen days prior to the day she denied him access, and that on each of those previous days Cook had permitted him access. As a result of her conduct, Plaintiff missed one of his eye treatments on that date.

### 4. Analysis

In order to support a claim for an Eighth Amendment violation, Plaintiff must prove that Defendants were deliberately indifferent to a serious health or safety need. Farmer v. Brennan, 511 U.S. 825, 834 (1994). However, even negligence in diagnosing or treating a medical condition does not constitute a claim of deliberate indifference. Estelle v. Gamble, 429 U.S. at 105-6. Rather, the "prisoner must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not rise to the level of a constitutional violation," Estate of Rosenberg v. Crandell, 56 F.3d 35, 37 (8th Cir. 1995). See also Smith v. Marcantonio, 910 F.2d 500, 502 (8th Cir. 1990) (holding that a mere disagreement with a course of medical treatment is insufficient to state a claim for relief

under the Eighth Amendment). Furthermore, prison physicians are entitled to exercise their medical judgment, and "do not violate the Eighth Amendment when, in the exercise of their professional judgment, they refuse to implement a prisoner's requested course of treatment." Long v. Nix, 86 F.3d 761, 765 (8th Cir. 1996). In addition, an inmate who complains that a delay in medical treatment constitutes a constitutional violation must provide "verifying medical evidence" in the record to establish the detrimental effect of the delay, in order to succeed on his claim. Beyerbach v. Sears, 49 F.3d 1324, 1326 (8th Cir. 1995) (overruled in part on other grounds). Finally, "[i]n the face of medical records indicating that treatment was provided and physician affidavits indicating that the care provided was adequate, an inmate cannot create a question of fact by merely stating that [he] did not feel [he] received adequate treatment." Dulany, 132 F.3d at 1240.

Having reviewed Plaintiff's Complaint, Defendants' Motion, and the evidence provided in support, the Court finds as a matter of law that the allegations against Defendants Dalsis, Lum and Cook do not support a finding of deliberate indifference. First, Plaintiff made a conscious decision not to wear the scratched safety goggles during his work on September 29, 2010, and he admits not telling Defendants Dalsis or Lum that they were unusable or that he needed a pair of safety goggles. He also admits prior experience in performing regional maintenance work and an awareness to use safety goggles. Next, he admits that Dalsis was not aware what was in Plaintiff's eye, that he was stationed on a horse with a gun and not permitted to get off the horse, and he admits that Dalsis permitted him to take a break to wash out his eye. He also admits that a fellow inmate was not able to see

anything in his eye. Even assuming Plaintiff's version of the facts as true, that Dalsis required him to wait from 9:15 a.m. until 10:45 a.m. to be seen by Defendant Lum, he provides no evidence that the delay caused any detriment to the condition of his eye. See Beyerbach v. Sears, 49 F.3d at 1326. He admits Defendant Dalsis permitted him to approach Defendant Lum as soon as break time occurred, and that Defendant Lum tried to locate the object in his eye and then tried to wash it out. Finally, he also provides no evidence of a detriment due to any delay which occurred as a result of Defendant Lum's decision to call for transport for Plaintiff, instead of transporting all other inmates, including Plaintiff, back to the Unit at that time.

Furthermore, Plaintiff provides no evidence of an intent by either Defendants Lum or Dalsis to cause him harm, or of a knowledge of a substantial risk of harm. Again, his fellow inmate was not able to see anything in Plaintiff's eye and Defendant Lum initially could not see anything in his eye. Both Defendants Dalsis and Lum permitted Plaintiff to wash his eye with water. As soon as Defendant Lum saw the glass sliver in his eye, she called for transport. This conduct does not support a finding of a deliberate or reckless disregard for Plaintiff's safety. In addition, in light of Plaintiff's knowledge of the need to wear safety goggles on certain occasions, and his conscious decision not to wear goggles on this occasion, Defendants' failure to offer him or require him to wear goggles does not support a finding of deliberate indifference. At most, such might support a finding of negligence, which is not actionable. See Estelle v. Gamble, 429 U.S. at 105-6.

Similarly, the Court finds no evidence to support a finding of deliberate indifference

on the part of Defendant Cook. Plaintiff testified that he received two doses of his eye drops prior to the incident, and one thereafter, and provides no evidence of a detriment to his eye as a result of a missed dose. Furthermore, he admits he did not have a written script to support his request to enter the infirmary, and he does not deny Defendant Cook's claim that no more than six inmates are permitted in the infirmary at one time. Even assuming Plaintiff's allegation as true, that Defendant Cook had permitted him unfettered access on nineteen days prior to this date, Plaintiff does not offer any evidence to support a knowledge by Cook of his condition and a reckless disregard to it, or an intent to harm. Furthermore, Plaintiff provides no evidence that on any of those nineteen prior occasions he was permitted access by Defendant when the infirmary was full, as it was on this date.

### B. Medical Defendants' Motion

#### 1. Affidavit of Dr. Joseph Hughes

Defendants present the affidavit of Dr. Hughes, who is the medical director at the McPherson Unit of the ADC, and employed by Corizon. (Doc. No. 60-2.) After reviewing Plaintiff's Complaint and his medical records, he concludes that Defendants Jackson and Hubbard provided appropriate care to Plaintiff. (Id. at pp. 3-4.) According to Jackson's notes, he was able to remove the foreign body from Plaintiff's eye with a moistened cotton-tipped applicator, and then rinsed it with saline. (Id. at p. 2.) Jackson applied a patch to Plaintiff's eye and then referred him to Hubbard. (Id.) When Hubbard saw Manning later that evening, she noted that his eye was irritated but she did not see anything in it, even though Plaintiff stated it felt like something was still in his eye. (Id.) She then completed

a consultation request stating that Plaintiff had an urgent need to be transported to the Jones Eye Cline the next day for an ophthalmology evaluation. (Id.)

Dr. Hughes notes that at the bottom of Hubbard's typed notes, there is a handwritten-note stating, "Dr. Warren look at pt," which indicates to him that when the regional medical director reviewed Hubbard's consultation request, he directed that Manning first be seen by the Cummins Unit physician, Dr. Warren. (Id. at pp. 2, 9.) Hughes also notes that Dr. Taylor, the optometrist at Varner (which shares a campus with Cummins),conducted an eye examination of Plaintiff on September 30, 2010, noted a 3 mm corneal laceration, and directed that he be transported to UAMS for surgery. (Id. at pp 3, 10.) According to UAMS records, Plaintiff underwent a twenty-seven minute procedure at UAMS later that evening to suture the wound, and was released the next day. (Id. at pp. 3, 11-15.) Plaintiff's sutures were removed on December 14, 2010, and the consultation report completed by the Jones Eye Center ophthalmologist states that his vision was 20/20. (Id. at pp. 3, 18.)

Based on his review of Plaintiff's records and treatment, Dr. Hughes states that the eye laceration was caused when the glass impaled itself into Plaintiff's eye, and that Jackson's actions in removing the glass was "a good result." (Id. at p. 3.) He notes that when Plaintiff complained that his vision became blurry after the sliver was removed, it was likely due to a corneal abrasion caused by the q-tip, which generally is temporary and heals in a matter of days. (Id.) Hughes adds that the "good result" was the removal of the glass and that the corneal abrasion was negligible. (Id. at pp 3-4.) He also states that Defendant Hubbard acted appropriately by examining Plaintiff's eye and completing a consult request

15

that Plaintiff be evaluated by an ophthalmologist. (Id.) The fact that Plaintiff was not immediately sent there, but first went to Cummins and then Varner, was not Hubbard's decision. (Id.) Finally, Dr. Hughes states that Plaintiff suffered no detrimental effect by the one-day delay in receiving sutures in his eye. (Id.)

### 2.     Defendants' Argument

Defendants state that their actions cannot support Plaintiff's claim of deliberate indifference. The laceration was caused when the glass impaled itself on Plaintiff's eye, and Plaintiff provides no proof that any of the Defendants' actions caused that laceration. As Dr. Hughes stated, removal of the glass by Defendant Jackson was a good result, and Plaintiff provides no evidence that the removal caused him additional harm. Plaintiff also provides no evidence that either Defendant Jackson or Hubbard were responsible for any delay in his receiving surgery, or that the one-day delay resulted in a detriment to his eye condition. As noted by his medical records, Plaintiff's vision was documented on December 14, 2010, as being 20/20, and Plaintiff presents no evidence that Defendants acted recklessly or with deliberate indifference to his needs.

### 3.     Plaintiff's Response

Plaintiff states in Response that Defendant Jackson was not properly trained to remove an object from his eye, that he tried to removed it three times before he was successful, and that he caused the hole to be bigger and fluid to leak out of it. He also complains that Defendant Jackson did not provide him with any pain medications. He states that Defendant Hubbard failed to complete an order for him to be transported to the emergency room, failed

to provide him with pain medication, and failed to lay him in from his job the next day.

### 4. Analysis

Again, the Court finds as a matter of law that Plaintiff's allegations against Defendants Jackson and Hubbard do not support constitutional violations. Plaintiff provides no evidence that they acted with deliberate indifference to his serious medical needs. It is clear that Jackson removed the object from Plaintiff's eye, and Plaintiff produces no evidence to show that the removal caused him additional harm or that Defendants' actions in removing the sliver were motivated by a reckless disregard to his health and safety. In addition, Plaintiff admits that he did not ask either Jackson or Hubbard for pain medications. His complaint with Hubbard – that she did not send him immediately to the emergency room – is completely unfounded, because the records show that she did refer him to be sent to the Jones Eye Clinic. Furthermore, Plaintiff provides no proof that any delay in his surgery caused detriment to his health. In fact, the records clearly show that his eyesight registered at 20/20 on December 14, 2010, and Plaintiff has provided no proof that after that time he suffered from any eyesight problems or after-effects of the Defendants' treatment.

## IV. Conclusion

IT IS, THEREFORE, RECOMMENDED that Defendants' Motions for Summary Judgment (Doc. Nos. 55, 58) be GRANTED, and Plaintiff's Complaint against Defendants be DISMISSED with prejudice.

IT IS SO RECOMMENDED this 22nd day of January, 2013.

                                                        _____
                                                        JEROME T. KEARNEY
                                                        UNITED STATES MAGISTRATE JUDGE